# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

RONNIE EDWARD REED,

    Plaintiff,

THOMAS KEVIN WATERS, in his official capacity as Sheriff of the City of Jacksonville, Florida; JOEL BELGARD, individually; NICHOLAS HACKLEY, individually; and UNIDENTIFIED UNDERCOVER OFFICER #1, individually,

    Defendants.
_____/

Case No.: 3:24-cv-00463

JURY TRIAL DEMANDED

## COMPLAINT FOR DAMAGES
## AND DEMAND FOR JURY TRIAL

Plaintiff, RONNIE EDWARD REED ("Mr. Reed"), by and through his undersigned counsel, sues Defendants THOMAS KEVIN WATERS, JOEL BELGARD, NICHOLAS HACKLEY, and UNIDENTIFIED UNDERCOVER OFFICER #1, and states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Mr. Reed is a person residing in Duval County, Florida and is a citizen of the United States.

2. Mr. Reed brings this action under 42 U.S.C § 1983 for violation of his civil rights under the Fourth Amendment to the United States Constitution.

3. This Court has subject-matter jurisdiction over this matter pursuant to the Unted States Constitution, 42 U.S.C. § 1983, 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343 (civil rights). The Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367.

4. Venue is proper in this judicial district and division pursuant to 28 U.S.C § 1391(b). The unlawful acts complained of give rise to the claims herein occurred within this district and division.

5. Defendant, Thomas Kevin Waters ("Sheriff Waters") is the Sheriff of the Jacksonville Sheriff's Office ("JSO") in Duval County, Florida.

6. Defendant, Nicholas Hackley ("Officer Hackley") is an officer with JSO.

7. Defendant, Joel Belgard ("Officer Belgard") is an officer with JSO.

8. Defendant, Unidentified Undercover Officer #1 ("Unidentified Undercover Officer #1") is an officer with JSO. Unidentified Undercover Officer #1's identify is currently unknown to Plaintiff but can easily be identified by JSO during discovery, as JSO is aware of his identity but has redacted all public information leading to the identity of this individual as well as other individuals involved in the allegations as contained herein from publicly available information.

## FACTS

9. On September 9, 2022, after Mr. Reed was done with work, he walked to a neighborhood store, a Mobile gas station located at 3037 Philips Highway in Jacksonville, Florida, and purchased two cans of beer.

2

10. After completing his purchase, Mr. Reed began walking back to his neighborhood, in anticipation of interacting with neighborhood friends. The streets between the Mobile gas station and Mr. Reed's neighborhood are frequently traversed by persons residing in Mr. Reed's neighborhood where the neighbors engage in social interaction.

11. Upon information and belief, on Mr. Reed's way home, an individual that Mr. Reed did not know, was walking in the same vicinity as Mr. Reed. Mr. Reed does not recall if an individual passed by him while walking.

12. That said, an individual named Charles Cobb, who is a stranger to Mr. Reed, was arrested by JSO in Mr. Reed's neighborhood on the same evening for selling crack cocaine to an undercover JSO officer. The marked funds from the JSO drug bust operation that resulted in Charles Cobbs' arrest were found in the possession of Charles Cobb, and the crack cocaine that Charles Cobb allegedly sold to the undercover JSO officer, was received from Charles Cobb.

13. Mr. Reed was walking back to his neighborhood when Unidentified Undercover Officer #1 exited an unmarked vehicle, immediately handcuffed Mr. Reed, and informed him that he needed to check something.

14. Unidentified Undercover Officer #1 took Mr. Reed behind the Sheik Sandwich shop, located at 2953 Phillips Highway, and searched Mr. Reed. The search entailed patting down Mr. Reed on the exterior of his clothing, removing Mr. Reed's shoes, unbuckling Mr. Reed's belt, unzipping Mr. Reeds pants, pulling his

pants and underwear slightly down, and searching inside the front and back of Mr. Reed's underwear.

15. Unidentified Undercover Officer #1 then pulled up Mr. Reed's britches, but left Mr. Reed's belt partially unbuckled.

16. Upon information and belief, Unidentified Undercover Officer #1 conducted the strip search of Mr. Reed because he needed to retrieve evidence, i.e., illegal drugs or JSO's marked funds, for probable cause to arrest Mr. Reed without a warrant.

17. Unidentified Undercover Officer #1 did not find illegal drugs or JSO marked funds on Mr. Reed's person.

18. Despite this Unidentified Officer #1 continued with Mr. Reed's detention, and removed him to a Phillips Highway location where multiple JSO Officers were positioned.

19. Mr. Reed was handed off to Officer Hackley who conducted an inventory search of Mr. Reed's possessions which consisted two cans of Heineken in a plastic bag, a white towel, a house key on his neck, and his wallet.

20. Officer Belgard, Officer Hackley, Officer Cody Melton, and, upon information and belief, Unidentified Undercover Officer #1, and other unidentified JSO officers, began discussing searching Mr. Reed again. Mr. Reed was surrounded by at least seven (7) JSO officers.

21. Mr. Reed laughed nervously and told them, "[m]y main man over here, he already took my clothes off."

22. Upon information and belief, either Officer Melton, or some other unidentified JSO officer, laughed and asked, "Who took your clothes off?"

23. Unidentified Undercover Officer #1 stated that when he was searching Mr. Reed's drawers he was jumping around.

24. Mr. Reed responded yeah, because you took me in the back and "cupped my nuts."

25. Officer Melton began making sexual jokes and stated to Officer Belgard that "You're a big nut advocate, aren't you?"

26. Officer Belgard responded, "I am" to which Officer Melton stated, "yeah, you're all about that shit."

27. The sexual joking on the side of Phillips Highway in the presence of seven (7) JSO officers caused Mr. Reed emotional distress.

28. Officer Belgard then began to unbuckle Mr. Reed's belt and unzip his pants.

29. While both Officer Hackley and Unidentified Undercover Officer #1 were standing next to Mr. Reed and Officer Belgard, Officer Belgard guided Mr. Reed a couple of steps away, stating, "I don't want her to look at your genitals."

30. Officer Belgard then pulled Mr. Reed's underwear out and began to touch and probe Mr. Reed's testicles and penis.

31. At this time, an unidentified person yelled, "Can you please get out of the road? You goanna lean on that car? It's not my car, it the city's car, so cool."

32. Officer Belgard then turned Mr. Reed around, pulled down Mr. Reed's pants, and instructed Mr. Reed to lean forward as he began to probe in between Mr. Reed's buttocks and poking at his anus.

33. Mr. Reed objected and said, "no, man", "bro, listen," and "stop."

34. Officer Belgard then told Mr. Reed, "stop, you're going to lean forward."

35. Mr. Reed objected continuously.

36. Officer Belgard again forcefully instructed Mr. Reed to stop, stating that he was not going to put anything inside of him, but that Mr. Reed had to let him look.

37. Officer Belgard and Officer Hackley held Mr. Reeds handcuffed arms up behind Mr. Reed's back forcing Mr. Reed to lean forward while they shined a flashlight on Mr. Reed's buttocks.

38. Mr. Reed told Officer Belgard and Officer Hackley that, "you can't bend me over that like, I know my rights."

39. Officer Belgard again told Mr. Reed to "stop!" and Officer Belgard then stated, "he's clenching hard, he's got something up there."

40. Mr. Reed responded that he wasn't clenching anything.

41. Unidentified Undercover Officer #1 then approached and told Officer Belgard and Officer Hackley to put Mr. Reed up against the car.

42. Unidentified Undercover Officer #1, Officer Belgard, and Officer Hackley then pinned Mr. Reed against the hood of a truck and shined a light on his buttocks.

43. Upon information and belief, Officer Belgard then stated, "It's up in his ass, I mean, he's clenched so hard."

44. Upon information and belief, either Unidentified Undercover Officer #1 or Officer Hackley responded, "probably."

45. Mr. Reed then yelled, "You were trying to stick your finger up my ass!"

46. Bystanders then began to yell, "Let them do that at the jail!"

47. An officer responded, "Yeah, they're going to do it at the jail[.]"

48. Mr. Reed in turn responded, "Yeah, let them do that at the jail, bro cause ya'll ain't fixin to stick your finger up my ass."

49. Officer Belgard then ordered, "I told you I wasn't, but if you just unclench your asshole and let it come out, you can just get the one charge now!"

50. As Officer Belgard pulled up Mr. Reed's pants, bystanders shouted obscenities at the JSO Officers.

51. Mr. Reed yelled out, "Auntie, back up, Auntie, back up, back up, back up, please. Please, please go in the yard, Auntie."

52. JSO's body-worn camera footage shows at least seven (7) JSO officers in the vicinity of Mr. Reed's search, none of whom intervened.

53. Mr. Reed was subsequently transported to JSO's pretrial detention center for a third strip search and full cavity search. Once again, no illegal drugs or

JSO marked money was found on Mr. Reed's person. Despite this, JSO proceeded with the arrest of Mr. Reed.

54. The arrest and booking report, which is highly redacted, falsely asserts that property, namely crack cocaine, was seized and retrieved from Mr. Reed's.

55. The JSO Arrest and Booking report also falsely states that the JSO marked money from the drug exchange between JSO officers and Charles Cobb had not been recovered.

56. The JSO Arrest and Booking report also states that there is body-camera footage of an alleged incident between Mr. Reed and Charles Cobb.

57. Mr. Reed was not released from JSO's pretrial detention center for thirteen (13) days until he was able to obtain a bond in the amount of $10,003.

58. During this timeframe Mr. Reed lost his job and his vehicle.

59. On April 17, 2023, The Tributary, a non-profit Florida publication, reported a story on JSO's search of Mr. Reed.

60. The Tributary obtained eleven (11) videos from JSO body-worn camera footage of the arrest and search of Mr. Reed. The Tributary article noted that the body-worn camera footage showed that the search of Mr. Reed was conducted in front of approximately six (6) civilians.

61. The Tributary reported that one of the JSO Officers can be heard on the body camera footage that he was glad his Field Training Officer trained him how to be a "d-bag".

62. The Tributary's request of JSO for information for the story and a complaint filed with JSO by a woman in Kansas who saw media coverage of Mr. Reed's search caused JSO to initiate an internal affairs investigation (the "IA Investigation") on March 15, 2023.

63. The IA Investigation was concluded on August 23, 2023.

64. The IA Investigation concluded that Officer Belgard and Officer Hackley violated JSO orders regarding strip searches, and that Officer Belgard and Officer Hackley "failed to conform to work standards." Both received written reprimands.

65. Officer Belgard and Officer Hackley claimed during the IA Investigation that neither of them had received training from JSO regarding conducting strip searches.

66. Despite Unidentified Undercover Officer #1 clearly participating in the strip search of Mr. Reed, he was not disciplined for the strip search.

67. Unidentified Undercover Officer #1 instead was disciplined for turning off his body-worn camera during his initial search of Mr. Reed. Unidentified Undercover Officer #1 testified that he had been trained to turn off his body-worn camera so as to not reveal JSO techniques.

68. Upon information and belief, Unidentified Undercover Officer #1 gave false testimony during the IA Investigation stating in a sworn statement that he only gave Mr. Reed a pat down search immediately after apprehending Mr. Reed.

69. However, this statement is belied by clear body-worn camera footage wherein Mr. Reed is telling Officer Hackley, Officer Belgard, Officer Melton, and Unidentified Undercover Officer #1 that his clothes had already been removed and his private parts touched. Indeed, Mr. Reed's belt had never been fully re-buckled and was still loose from the first strip search.

70. Unidentified Undercover Officer #1 also falsely testified that he did not realize that while he was holding Mr. Reed down to the hood of the truck, that he did not realize Mr. Reed was being strip searched.

71. JSO Officer Axel Pugh, who was present when Mr. Reed was searched, testified that he could overhear the conversations of all of the other JSO officers at the scene. Officer Pugh testified that the JSO officers thought that Mr. Reed had something "tucked up in his butt."

72. During the IA Investigation, JSO Officer Melton was asked if anyone was instructed to search Mr. Reed, and Officer Melton testified, "it's standard policy for us to search people." Officer Melton further stated, "at that point when they were around you could tell he was clenching hard, as if like with our training and experience that usually means you have drugs in your private area or somewhere around there and that's when they went to go search him."

73. Officer Melton testified that while Mr. Reed was standing with his clothes on, the gaggle of JSO officers could tell that Mr. Reed was clenching. Specifically, Melton stated "you could see like his, his buttocks was really tight[.]"

74. Officer Melton testified that the other JSO officers could similarly tell that Mr. Reed was clenching his buttocks, apparently hiding something.

75. Officer Melton testified that Officer Belgard, Officer Hackley and others were looking for the JSO marked funds.

76. However, Officer Belgard had already located the JSO marked funds in the possession of Charles Cobb. This information was not filed on the public docket, but upon information and belief, was only filed in a second incident report within JSO's internal reporting system. It is unknown whether or not this information was provided to the State Attorney's Office, Mr. Reed's public defenders, or Mr. Reed's privately hired defense attorney.

77. Although multiple bystanders clearly understanding that Mr. Reed was being strip searched on the side of a public road, JSO found that four (4) unidentified officers had no information to share regarding the strip search of Mr. Reed, despite the fact that approximately seven (7) or more officers were standing nearby while JSO officers conducted Mr. Reed's strip search. Not one of those officers objected to, or intervened, in Mr. Reed's strip search, nothwithstanding it being a clear violation of JSO policy.

78. Nearly a year and a half after Mr. Reed's arrest, all charges against Mr. Reed were dropped on February 14, 2024.

79. During the timeframe between Mr. Reed's arrest, and the dismissal of charges against Mr. Reed, he appeared in court over fifteen (15) times.

# CAUSES OF ACTION

## Count I: Violation of the Fourth Amendment to the United States Constitution under 42 U.S.C. § 1983
### (Unreasonable Search)
### (Against all Defendants)

80. Mr. Reed reincorporates and realleges by reference the allegations of paragraphs 1 through 79, as though fully alleged herein.

81. The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches and seizures."

82. Mr. Reed had a reasonable expectation of privacy while he walked back to his neighborhood and while he was being detained on a public street.

83. Mr. Reed did not consent to being strip searched.

84. It clearly established that "people harbor a reasonable expectation of privacy in their "private parts[,]" and that "deeply imbedded in our culture . . . is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their 'private' parts observed or touched by others." *Justice v. Peachtree City*, 961 F.2d 188, 191 (11th Cir. 1992) (citations and quotations omitted).

85. Further, it is clearly established that "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street." *Illinois v. Lafayette*, 462 U.S. 640, 645 (1983).

86. The actions of Defendants, acting under the color of state law, violated Mr. Reed's clearly established Constitutional rights of which the Defendants were

aware. All Defendants, and other unidentified JSO officers understood clearly that the actions complained of herein violated Mr. Reed's rights.

87. It was unreasonable to conduct a public, highly intrusive, humiliating and harmful strip search of Mr. Reed.

88. There were no exigent circumstances justifying a public, highly intrusive, humiliating and harmful strip search of Mr. Reed.

89. As a direct and proximate cause of the unreasonable searches of Mr. Reed, Mr. Reed has suffered damages which include mental distress, embarrassment, humiliation, disgrace and injury to his feelings, and continues to have distressing memories of the strip search, and acute anxiety in public to this date.

90. Mr. Reed has been damaged by reason of Defendants' actions.

91. Mr. Reed is entitled to attorneys' fees and costs as appropriate and permitted by law, pursuant to 42 U.S.C. § 1988.

### Count II: Violation of the Fourth Amendment to the United States Constitution under 42 U.S.C. § 1983
**(Against Sheriff Waters in his official capacity)**
**(Monell claim)**

92. Mr. Reed reincorporates and realleges by reference the allegations of paragraphs 1 through 79, as though fully alleged herein.

93. Mr. Reed was deprived of his Fourth Amendment Rights when Defendants conducted an unreasonable, public, highly intrusive, humiliating and harmful strip search of Mr. Reed.

94. JSO has an unofficial custom and/or policy to allow its deputies to conduct strip searches, touching people's private parts, in public, without exigent circumstances.

95. This unofficial custom and/or policy was demonstrated and is evidenced by the lack of any objection of any JSO officer on the scene of Mr. Reed's search, despite the search clearly violating JSO orders and policy.

96. This unofficial custom and/or policy is further evidenced by the fact that JSO, by and through its Field Training Officers, trains its officers in a *de jure* manner that is contrary and to JSO's *de facto* orders and policy.

97. Upon information and belief, JSO has wide-spread knowledge of this unofficial custom/and or policy, and this unofficial custom/and or policy is pervasive and has resulted in many illegal searches of individuals in Duval County.

98. Sheriff Waters in his official capacity is responsible for the training of all JSO officers.

99. Sheriff Waters in his individual capacity is the final policymaker for JSO for the training received by all JSO deputies.

100. Upon information and belief, Sheriff Waters has direct knowledge of this unofficial custom and/or policy.

101. Sheriff Waters failed to train JSO officers regarding conducting unconstitutional strip searches of detainees in public places.

102. The need for training regarding what amounts to an unconstitutional strip searches is clearly obvious, as it is likely that all officers in their daily duties will

encounter situation where they believe that individuals may be hiding contraband, weapons or drugs within the confines of their private parts.

103. Sheriff Waters' failure to train JSO officers regarding what constitutes an unconstitutional strip search evidence deliberate indifference to the civil rights of all persons within Duval County.

104. As a direct and proximate cause of the deliberate indifference of Sheriff Waters, Mr. Reed has suffered damages which include mental distress, embarrassment, humiliation, disgrace and injury to his feelings, and continues to have distressing memories of the strip search, and acute anxiety in public to this date.

105. Mr. Reed has been damaged by reason of Defendants' actions.

106. Mr. Reed is entitled to attorneys' fees and costs as appropriate and permitted by law, pursuant to 42 U.S.C. § 1988.

### Count III: Negligence *Per Se* under Florida Statute § 901.211
### (Against Officer Belgard, Officer Hackley, and Unidentified Undercover Officer #1)

107. Mr. Reed reincorporates and realleges by reference the allegations of paragraphs 1 through 79, as though fully alleged herein.

108. Florida Statute §901.211 - Strip searches of persons arrested; body cavity search — provides in relevant part

> (1) As used in this section, the term "strip search" means having an arrested person remove or arrange some or all of his or her clothing so as to permit a visual or manual inspection of the

genitals; buttocks; anus; breasts, in the case of a female; or undergarments of such person.

(2) No person arrested for a traffic, regulatory, or misdemeanor offense, except in a case which is violent in nature, which involves a weapon, or which involves a controlled substance, shall be strip searched unless:

    (a) There is probable cause to believe that the individual is concealing a weapon, a controlled substance, or stolen property; or

    (b) A judge at first appearance has found that the person arrested cannot be released either on recognizance or bond and therefore shall be incarcerated in the county jail.

(3) Each strip search shall be performed by a person of the same gender as the arrested person and on premises where the search cannot be observed by persons not physically conducting or observing the search pursuant to this section. Any observer shall be of the same gender as the arrested person.

(4) Any body cavity search must be performed under sanitary conditions.

(5) No law enforcement officer shall order a strip search within the agency or facility without obtaining the written authorization of the supervising officer on duty.

109. Strip searches are by their very nature significantly intrusive, humiliating, degrading, and harmful.

110. Florida Statute § 901.211 was initially passed in 1981 with the intent to regulate police behavior with respect to strip searches, because public concern had arisen over police behavior, primarily police commonly conducting arbitrary strip searches, and strip searches in an improper manner.

The State of Florida concluded behavior of that nature by officers acting under the color of state law would not continue in the State of Florida.

111. Mr. Reed is a person that Florida Statute § 901.211 is intended to protect from the harmful effects of arbitrary strip searches after arrest.

112. Officer Belgard, Officer Hackley, and Unidentified Undercover Officer #1 strip searched Mr. Reed in public, where the strip search could be observed by those not conducting the strip search, and in view of bystanders, without proper authorization in violation of state statute.

113. Upon information and belief, many other JSO officers at the scene also understood that Mr. Reed was being publicly strip searched and failed to intervene.

114. Florida Statute § 901.211 gives clear and fair warning as to the expectation of conduct of law enforcement officers in the State of Florida.

115. As a direct and proximate cause of the unreasonable searches of Mr. Reed, Mr. Reed has suffered damages which include mental distress, embarrassment, humiliation, disgrace and injury to his feelings, and continues to have distressing memories of the strip search, and acute anxiety in public to this date.

116. Mr. Reed has been damaged by reason of Defendants' actions.

### Count IV: Declaratory Judgment, 28 U.S.C. § 2201
**(Against all Defendants)**

117. Mr. Reed reincorporates and realleges by reference the allegations of paragraphs 1 through 80, and Counts I through III, as though fully alleged herein.

118. An actual controversy has arisen and now exists relating to the rights and duties of the parties herein in that Mr. Reed contends that Defendants violated his rights not to be subjected to unreasonable searches under the Fourth Amendment and subjected to unlawful strip searches under Florida Statute.

119. Mr. Reed seeks a judicial declaration of the rights and duties of the respective parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Ronnie Reed respectfully requests that this Court:

A. Enter a judgment for nominal, compensatory, and punitive damages in favor of Mr. Reed, against Defendants, in an amount to be determined at trial, plus reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b).

B. Enter declaratory judgment that the actions complained of in this complaint are unlawful and violate the Fourth Amendment and Florida Statute §902.211, and

C. Grant Mr. Reed such other and further relief as may be just and proper.

## JURY DEMAND

Mr. Reed respectfully demands a trial by jury on all issues so triable.

Respectfully submitted this 9th day of May, 2024.

**JOHN D. WEBB, P.A.**

*s/ John D. Webb*
John D. "Jack" Webb
Florida Bar Number: 0051871
1662 Stockton St., Ste. 201

Jacksonville, Florida 32204
Telephone: (904) 803-4686
Primary Email:
jwebb@jackwebblaw.com
Secondary Email:
arichey@jackwebblaw.com
kvarnes@jackwebblaw.com