## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

RONNIE EDWARD REED,

      Plaintiff,

v.                                                                Case No. 3:24-cv-463-MMH-SJH

THOMAS KEVIN WATERS, in his
official capacity as Sheriff of the
City of Jacksonville, Florida, et al.,

      Defendants.

_____

# <u>O R D E R</u>

**THIS CAUSE** is before the Court on Defendant Thomas Kevin Waters's

Motion to Dismiss the Amended Complaint (Doc. 33; Sheriff's Motion), filed on

August 28, 2024, and Defendants Joel Belgard, Nicholas Hackley, and Mark

Mazzone's Individual Defendants' Motion to Dismiss Counts III and IV of the

Amended Complaint with Incorporated Memorandum of Law (Doc. 32; Officers'

Motion), filed on August 20, 2024. In the Motions, Defendants seek dismissal of

Plaintiff Ronnie Reed's Amended Complaint for Damages and Demand for Jury

Trial (Doc. 30; Complaint) under Rule 12(b)(6) of the Federal Rules of Civil

Procedure (Rule(s)). Reed timely filed responses to both Motions. See Plaintiff's

Response in Opposition to Thomas Kevin Waters's Motion to Dismiss Amended

Complaint (Doc. 37; Response to the Sheriff's Motion), filed on September 18,

2023; Plaintiff's Response in Opposition to Individual Defendants' Motion to Dismiss Counts III and IV of the Amended Complaint (Doc. 36; Response to the Officers' Motion), filed on September 16, 2023. Accordingly, this matter is ripe for review.

## I.     Legal Standard

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Rule(s)), the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 & n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262–63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary," the complaint should "'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the plaintiff has failed to meet their pleading burden under Rule 8. Id. at 679.

The "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (quotation marks and quoted authority omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 679. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

## II.    Background[1]

### A.    Factual Background

In the Complaint, Reed alleges the following facts. After Reed finished work on September 9, 2022, he went to the corner store, bought two cans of beer, and headed into his neighborhood hoping for a social evening with friends. Complaint ¶¶ 9, 10. On the same evening in the same neighborhood, one or more officers from the Jacksonville Sheriff's Office (JSO) arrested one Charles Cobb in a sting operation after Cobb sold drugs to an undercover officer. Id. ¶ 12. JSO recovered marked bills and crack from Cobb, "a stranger to Reed." Id.

While Reed was walking home that evening, JSO Officer Mazzone "exited an unmarked vehicle, immediately handcuffed [Reed], and informed him that he needed to check something." Id. ¶ 13. Mazzone took Reed behind a store and searched him. Id. ¶ 14. In the search, Mazzone "patt[ed] down [Reed] on the exterior of his clothing, remov[ed] [his] shoes, unbuckl[ed] [his] belt, unzipp[ed] [his] pants, pull[ed] his pants and underwear slightly down, and search[ed] inside the front and back of [his] underwear." Id. Mazzone then pulled Reed's

---

[1] In considering the Motion, the Court must accept all factual allegations in the Complaint as true, consider the allegations in the light most favorable to Reed, and accept all reasonable inferences that can be drawn from such allegations. See Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from the Complaint and may well differ from those that ultimately can be proved.

pants back up, but "left [his] belt partially unbuckled." Id. ¶ 15. "Mazzone did not find illegal drugs or JSO[-]marked funds … ." Id. ¶ 17.

Despite the fact Mazzone found no drug-related evidence on Reed, Mazzone continued to detain Reed "and removed him to" a nearby area "where multiple JSO Officers were positioned." Id. ¶ 18. Bystanders were in the area who could observe the scene. See id. ¶¶ 31, 46, 51, 60. "Reed was handed off to Officer Hackley who conducted an inventory search," recovering "two cans of Heineken … , a white towel, a house key … , and his wallet." Id. ¶ 19. "Officer Belgard, Officer Hackley, Officer Cody Melton, Officer Mazzone, and other unidentified JSO officers[ ] began discussing searching [him] again." Id. ¶ 20. In all, "at least seven" JSO officers were on the scene. Id. Reed and Mazzone told the other officers about Mazzone's search. Id. ¶¶ 21–24. Mazzone told them that during the search, Reed "was jumping around," and Reed replied "yeah, because you took me in the back and cupped my nuts." Id. ¶¶ 23, 24 (quotation marks omitted).

One officer "began making sexual jokes" and asked Belgard, "You're a big nut advocate, aren't you?" Id. ¶ 25. Belgard responded that he was. Id. ¶ 26. "Belgard then began to unbuckle [Reed's] belt and unzip his pants." Id. ¶ 28. "Belgard then pulled [Reed's] underwear out and began to touch and probe [Reed's] testicles and penis." Id. ¶ 30. Over Reed's protests, Belgard and

Hackley then "held [Reed's] handcuffed arms up behind [his] back[,] forcing [Reed] to lean forward while they shined a flashlight on [his] buttocks." Id. ¶ 37. Belgard said, "he's clenching hard, he's got something up there." Id. ¶ 39.

Mazzone approached and told Belgard and Hackley (the three of them, the Officers) to put Reed "up against the car." Id. ¶ 41. The Officers "then pinned [Reed] against the hood of a truck and shined a light on his buttocks." Id. ¶ 42. Belgard repeated his belief that Reed was clenching and that this indicated "it's up in his ass." Id. ¶ 43. Reed yelled that an officer was trying to insert a finger, and bystanders protested the Officers' conduct. Id. ¶¶ 45, 46, 50. None of the officers present "objected to[ ] or intervened" in the search, "notwithstanding it being a clear violation of JSO policy." Id. ¶ 77. The Officers ended the search and transported Reed to JSO's pretrial detention center "for a third strip search and full cavity search. Once again, no illegal drugs or JSO[-]marked money was found … ." Id. ¶ 53. Despite this, Reed was booked on drug charges. Id. ¶ 54.

Reed was confined for thirteen days, during which he "lost his job and his vehicle." Id. ¶ 57, 58. Local media reported on Reed's search the following year. Id. ¶ 59. All charges against Reed were dropped in early 2024. Id. ¶ 78.

The media reported that review of eleven body-cam videos revealed the second search "was conducted in front of approximately six … civilians." Id. ¶ 60. In one video, the media reported, an unidentified officer can be heard

saying "that he was glad his Field Training Officer trained him how to be a 'd-bag.'" Id. ¶ 61.

JSO "initiate[d] an internal affairs investigation (the 'IA Investigation') on March 15, 2023." Id. ¶ 62. "The IA Investigation concluded that … Belgard and … Hackley violated JSO orders regarding strip searches, and that … Belgard and … Hackley 'failed to conform to work standards.' Both received written reprimands." Id. ¶ 64. Belgard and Hackley "claimed during the IA Investigation that neither of them had received training from JSO regarding conducting strip searches." Id. ¶ 65. Mazzone was not disciplined for the searches themselves, but was "disciplined for turning off his body-worn camera during his initial search … ." Id. ¶ 66, 67.

During the IA Investigation, "Mazzone testified that he had been trained to turn off his body-worn camera so as to not reveal JSO techniques." Id. ¶ 67. Melton, when asked if the Officers were instructed to conduct the search, responded, "it's standard policy for us to search people." Id. ¶ 72. He also explained the rationale of the search, stating, "at that point when they were around you could tell he was clenching hard, as if like with our training and experience that usually means you have drugs in your private area or somewhere around there and that's when they went to go search him." Id. ¶ 72.

B.    Procedural Background

In the Complaint, Reed brings claims in four counts. See id. at 11, 13, 15, 17. In Count I, Reed asserts claims against the Officers in their individual capacities under 42 U.S.C. § 1983,[2] alleging the search was unreasonable in violation of the Fourth Amendment. See id. at 11–13. In Count II, Reed brings a claim against Waters in his official capacity[3] under § 1983 and Monell,[4] alleging that JSO has an unofficial custom and policy to allow unconstitutional strip searches and that JSO also fails to train officers as to how to conduct searches in a constitutional manner. See id. at 13–14. In Count III, Reed brings claims against the Officers in their personal capacities for negligence per se under Florida state law, alleging the searches violated Florida Statute section 901.211.[5] See id. at 15–17. In Count IV, Reed brings claims against the Officers

---

[2] 42 U.S.C. § 1983 provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law … ." Id.

[3] At the outset, the Court notes that "[f]or liability purposes, a suit against a public official in his official capacity is considered a suit against the local governmental entity he represents." Vineyard v. Cnty. of Murray, 990 F.2d 1207, 1210 n.3 (11th Cir. 1993) (citation omitted). Reed's claim against Waters in his official capacity is thus a claim against JSO; accordingly, the Court refers to Waters as "the Sheriff" throughout this Order.

[4] See Monell v. Dep't of Social Servs., 436 U.S. 658 (1978) (holding that municipalities and other subdivisions of states are "persons" under § 1983).

[5] Section 901.211 defines the "who, what, when, where, and how" of strip searching in Florida. See Fla. Stat. § 901.211.

and the Sheriff under 28 U.S.C. § 2201, seeking declaratory relief. See id. at 17. In doing so, Reed alleges, "An actual controversy has arisen and now exists relating to the rights and duties of the parties … in that [Reed] contends that Defendants violated his rights not to be subjected to unreasonable searches under the Fourth Amendment and subjected to unlawful strip searches under Florida Statute." Id. ¶ 118. In Count IV, Reed also "reincorporates and realleges … Counts I through III … ." Id. ¶ 117.

The Officers move to dismiss Count III for failure to state a claim and Count IV for mootness and lack of standing. See generally Officers' Motion. The Sheriff moves to dismiss Count II for failure to state a claim. See generally Sheriff's Motion. And, also moves to dismiss Count IV on the same grounds urged by the Officers. See generally id. For the reasons that follow, the Court concludes the Motions are due to be granted as to Count IV, the Officers' Motion is due to be granted as to Count III, and the Sheriff's Motion is due to be granted in part and denied in part as to Count II.

### III.   Discussion

   A.   <u>Monell</u> Claims (Count II)

   In <u>Monell</u>, the Supreme Court held that municipalities[6] can be held liable as "persons" under § 1983. <u>See generally</u> <u>Monell</u>, 436 U.S. 658. But the Court soundly rejected the theory of <u>respondeat</u> <u>superior</u> as a basis for liability in such cases. <u>See</u> <u>id.</u> Instead, a municipality may be liable in a § 1983 action "only where the municipality <u>itself</u> causes the constitutional violation at issue." <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.</u>, 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). As such, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011) (quoting <u>Monell</u>, 436 U.S. at 691). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "distinguish acts of the <u>municipality</u> from acts of <u>employees</u> of the municipality, and thereby make clear that municipal liability

---

   [6] For simplicity, the Court uses the term "municipality" throughout this Order to refer to any "local government unit" covered by § 1983 under <u>Monell</u>. <u>See</u> <u>Monell</u>, 436 U.S. at 690 (quoted).

is limited to action for which the municipality is actually responsible." Grech v. Clayton Cnty., 335 F.3d 1326, 1329 n.5 (11th Cir. 2003) (en banc) (internal quotation marks and quoted authority omitted). Indeed, municipal liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483 (1986)).

There are two theories a typical plaintiff can rely on to establish that a municipal policy or custom caused a violation of the individual's constitutional rights. See Connick, 563 U.S. at 60–62. First, a plaintiff can establish the existence of an official municipal policy by proving that lawmakers or policymaking officials took direct action, or by proving the existence of "practices so persistent and widespread as to practically have the force of law." Id. at 61. Second, inadequate training can rise to the level of an actionable policy when the "failure to train … employees in a relevant respect … amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (quoting Canton, 489 U.S. at 388) (second alteration in original). Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (internal quotation marks and quoted authority

omitted). Thus, each theory requires proof of different elements: the former requires evidence of either direct action by a municipal authority figure or pervasive customs, while the latter requires evidence of the municipality's state of mind in relation to its training efforts.

Bringing these theories together in a single count defies the spirit, if not the letter, of the Eleventh Circuit's prohibition on shotgun pleadings. By combining these claims, Reed makes it more difficult for "his adversary [to] discern what he is claiming and frame a responsive pleading," more difficult for "the court [to] determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted," and, at trial, more difficult for the court to determine what evidence is relevant and what is not. See Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015) (quoted) (internal quotation marks and quoted authority omitted). Because each theory of municipal liability requires the proof of different elements, bringing them both in a single count can unduly complicate discovery and unnecessarily confuses the issues at all stages of the proceedings. Nevertheless, because Reed advances both of these theories in Count II, the Court will address the theories in turn.

1.     Practice and Custom

In the Sheriff's Motion, the Sheriff contends that Reed "has not alleged any facts supporting the inference … that the City, by failing to take disciplinary action against individual officers, ratified a departmentwide custom of permitting excessive force." Sheriff's Motion at 7–8. In the Response to the Sheriff's Motion, Reed contends that his allegations plausibly show that JSO, by failing to take corrective action, ratified a widespread pattern and custom of similar unconstitutional strip searches. Id. at 5, 7–10. For the reasons that follow, the Court concludes that the Sheriff's Motion is due to be granted to the extent Reed advances the theory that a widespread JSO custom caused his injury.

A municipality will rarely have an officially adopted policy that permits a particular constitutional violation; therefore, to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the municipality has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). The Eleventh Circuit has defined a "custom" as "a practice that is so settled and permanent that it takes on the force of law." McDowell, 392 F.3d at 1290 (internal quotation marks and quoted authority omitted). "In order for a plaintiff to demonstrate a policy or custom, it is 'generally necessary to show a persistent and wide-spread

practice.'" <u>Id.</u> (quoted authority omitted). "This prevents the imposition of liability based upon an isolated incident." <u>Id.</u> A single incident of misconduct can be considered an official policy under a ratification theory, but a plaintiff "must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable … .'" <u>Salvato v. Miley</u>, 790 F.3d 1286, 1296 (11th Cir. 2015). And only when faced with repeated misconduct can "persistent failure to take disciplinary action against officers … give rise to the inference that a municipality has ratified conduct, thereby establishing an unconstitutional custom that can subject the government to liability." <u>Id.</u> (cleaned up) (authority omitted).

Here, Reed has failed to allege a custom or practice of JSO officers violating the Fourth Amendment when searching detainees for evidence. While Reed's allegations—that a group of seven JSO officers either participated in or stood silently by his roadside strip search—permit, when taken as true, some troubling inferences, the allegations fall far short of making plausible that unconstitutional strip searching is "a practice that is so settled and permanent that it takes on the force of law" or is a "persistent and wide-spread practice" within JSO. <u>See</u> <u>McDowell</u>, 392 F.3d at 1290 (quoted). Reed's allegations fail to suggest that his search was anything more than "an isolated incident," and as

- 14 -

such, cannot be the basis for liability of the Sheriff himself given that Reed does not allege that JSO policymakers reviewed and approved the Officers' search before it happened. See id. (quoted); Salvato, 790 F.3d at 1296.

Reed's arguments to the contrary fall short. Reed contends that the existence of a custom "was demonstrated … by the lack of any objection of any JSO officer on the scene … despite the search clearly violating JSO orders and policy." Id. ¶ 95. While a custom is one possible explanation for the officers' silence, simple silence fails to carry the weight of plausibility under Iqbal. Reed further argues that JSO's failure to discipline Mazzone for the searches permits the reasonable inference that "JSO tacitly condones, if not approves, of unconstitutional strip searches … ." See Response to the Sheriff's Motion at 9. But JSO did discipline Belgard and Hackley. See Complaint ¶ 64. Thus, the most favorable reasonable inference that can be drawn from JSO failing to discipline Mazzone is that JSO turned a blind eye to this particular instance of misconduct involving this particular officer. Regardless, the disciplinary results of a single investigation do not permit the Court to infer that similar misconduct is widespread within JSO, let alone that such misconduct is a policy with the force of law. See Salvato, 790 F.3d at 1296. Reed also argues that the facts that one Officer "bragged that he was trained to be a 'd-bag'" and that Mazzone claimed to be trained to turn off his body cam during strip searches support the

inference that JSO has an officially sanctioned custom of violating Fourth Amendment rights during searches. <u>Id.</u> at 8–10. But individual failures of training do not a custom make. Last, Reed points to the statements made by Melton, who, when asked if the Officers were instructed to conduct the search, responded, "it's standard policy for us to search people." <u>Id.</u> ¶ 72. He also explained the rationale of the search, stating, "you could tell he was clenching hard," and "with our training and experience that usually means you have drugs in your private area … and that's when they went to go search him." <u>Id.</u> ¶ 72. But these vague references to "standard policy" and "training and experience" are not enough to make it plausible that JSO has a widespread custom of conducting unconstitutional strip searches on busy streets. At most, these allegations make it plausible that Melton's training was lacking. In sum, even viewing the allegations in the Complaint as a whole, Reed has failed to provide factual allegations to make it plausible, as opposed to possible, that unconstitutional strip searches are a widespread, settled practice within JSO. Accordingly, the Sheriff's Motion is due to be granted as to Count II to the extent Reed advances the theory that there is a widespread JSO custom of conducting unconstitutional strip searches.

2.     Deliberate Indifference

In the Response to the Sheriff's Motion, Reed argues that the allegations plausibly show a complete failure to train that is "so obvious" that it amounts to deliberate indifference. Id. at 5–8. According to the Sheriff, "[Reed's] alleged facts do not allow for the plausible inference that based on this single incident 'the need for training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" Id. at 8 (quoting Aracena v. Gruler, 347 F. Supp. 3d 1107, 1121 (M.D. Fla. 2018)) (internal quotation marks and quoted authority omitted) (second alteration in original). For the reasons that follow, the Court concludes that the Sheriff's Motion is due to be denied to the extent Reed advances the theory that the Sheriff failed to train his officers on the constitutional limitations of strip searches and that this failure amounts to deliberate indifference to the public's Fourth Amendment rights. In reaching this conclusion, the Court is careful to highlight that at this stage in the proceedings, neither side has been required to bring forth evidence, and the Sheriff may, with evidence, be able to successfully rebut the allegations of deliberate indifference at later stages of the proceedings.

As a preliminary matter, for the reasons discussed below and accepting Reed's allegations as true for the purpose of resolving the Motions, the Court concludes that Reed plausibly alleges that the Officers violated his Fourth Amendment right to be free from unreasonable searches. Notably, Defendants do not argue otherwise. See generally Sheriff's Motion; Officers' Motion. Still, the Court will address this issue because, as discussed below, whether the Officers' actions violated the Fourth Amendment is relevant to whether JSO can be held liable for failing to train its officers.

Whether a given search is reasonable under the Fourth Amendment is an inherently fact-sensitive inquiry. See Bell v. Wolfish, 441 U.S. 520, 559 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."). To make the reasonableness determination, the Court must balance "the need for the particular search against the invasion of personal rights that the search entails." Id. Of particular relevance are "the scope of the particular intrusion, the manner in which it [was] conducted, the justification for initiating it, and the place in which it [was] conducted." Id. When the aim of a strip search is to uncover evidence, "an officer must have at least a reasonable suspicion that the strip search is necessary for evidentiary reasons." Evans v. Stephens, 407 F.3d 1272, 1279 (11th Cir. 2005) (en banc).

- 18 -

As alleged in the Complaint, the Officers' searches were highly intrusive. During the second search, for instance, the Officers allegedly used sexually threatening language, fondled Reed's genitals, and shined flashlights on his anus, all within view of bystanders on a public street. Drawing all reasonable inferences in Reed's favor, the Officers lacked "reasonable suspicion that the strip search [was] necessary" to uncover evidence. See Evans, 407 F.3d at 1279 (quoted). And as alleged, any justification was plausibly outweighed by the intrusiveness of the searches.[7] As such, Reed has plausibly alleged that the searches were unreasonable in violation of the Fourth Amendment.[8]

In some circumstances, "the failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable if it actually causes injury." City of Canton, 489 U.S. at 390. However, failure to train can lead to municipal liability "only where a municipality's failure to train its employees in a relevant respect

---

[7] In the Complaint, Reed describes two searches ostensibly performed to uncover evidence. However, the Court notes that the searches as alleged also plausibly violated the Fourth Amendment if they were performed as searches incident to arrest. See Illinois v. Lafayette, 462 U.S. 640, 645 (1983) ("[T]he interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street … .").

[8] The Court emphasizes that any conclusions in this Order as to the constitutionality of the search are based on Reed's allegations in the Complaint. Whether Reed can ultimately provide evidence to prove these allegations is another matter and not material to resolving the Motions. Likewise, at later stages in the proceedings, JSO may be able to produce evidence to support a conclusion that the searches the Officers actually conducted were reasonable and, as such, not unconstitutional.

evidences a 'deliberate indifference' to the rights of its inhabitants [such that the failure to train] can be properly thought of as a [municipality's] 'policy or custom' that is actionable under § 1983." Id. at 389. For the indifference evidenced by a failure to train to be deliberate, a plaintiff must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998); see also Underwood v. City of Bessemer, 11 F.4th 1317, 1333 (11th Cir. 2021). "In resolving the issue of the [municipality's] liability, 'the focus must be on the adequacy of the training programs in relation to the tasks the particular officers must perform,' and not merely on the training deficiencies for a particular officer." Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1293 (11th Cir. 2009) (quoted authority omitted).

The Eleventh Circuit has repeatedly held that "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." Gold, 151 F.3d at 1351. Municipalities are usually put on notice of the need for training in one of two ways. See Lewis, 561 F.3d at 1293. "First, if the [municipality] is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training," the municipality "is considered to be deliberately

indifferent." Id. (authority omitted). But here, just as Reed has failed to allege the existence of a custom, as explained in Section III.A.1., supra, Reed also has failed to allege that JSO has "a pattern of constitutional violations," let alone that the Sheriff was "aware of [its] existence." See id. (quoted).

Alternatively, a plaintiff may prove "deliberate indifference … without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious." Id. (authority omitted). This second possibility—the "obvious need" theory—is based on the hypothesis that "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997). "The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights" can "justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." Id. "The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." Id. at 409–10. Importantly, whether a given action in fact violated the constitution also

informs whether the municipality was on notice of the potential legal ramifications of failing to train. See <u>Lewis</u>, 561 F.3d at 1293 ("Notably, in … the case at bar … , hogtying or 'fettering' under the given circumstances does not violate the Fourth Amendment. The [municipality] is therefore unlikely to be on notice of its potential legal ramifications in this context.").

Both the Supreme Court and the Eleventh Circuit have recognized the "obvious need" theory. The Supreme Court first theorized that an "obvious need" for training could amount to deliberate indifference in dictum in a footnote in <u>City of Canton</u>. See <u>Connick</u>, 563 U.S. at 63 ("In <u>Canton</u>, the Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference.") (quoting <u>Bryan Cnty.</u>, 520 U.S. at 409). In the "<u>Canton</u> hypothetical," <u>see</u> <u>id.</u> at 67, the Court noted that providing officers firearms but failing to train them in the use of deadly force could amount to deliberate indifference to the right of the people to be free from excessive force. <u>City of Canton</u>, 489 U.S. at 390 n.10. Yet the Court found that there was no "obvious need for police officers to be trained in diagnosing mental illness." <u>Id.</u> at 396–97 (O'Connor, J., concurring in part and dissenting in part); <u>accord</u> <u>Gold</u>, 151 F.3d at 1352 (quoted). Almost a decade later, in <u>Bryan County</u>, the Court declined to extend the "obvious need" theory from the failure-to-train context to the inadequate-screening context.

<u>Bryan Cnty.</u>, 520 U.S. at 409–10. Then in <u>Connick</u>, the Supreme Court considered whether there would be an obvious need for a district attorney's office to train prosecutors on their <u>Brady</u> obligations. <u>Connick</u>, 563 U.S. at 63–68. The Court held there was not, focusing its analysis on the difference between lawyers and the law-enforcement officers in the <u>Canton</u> hypothetical:

> Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training. In stark contrast, legal "[t]raining is what differentiates attorneys from average public employees."

<u>Id.</u> at 64 (quoted authority omitted) (alteration in original). In short, "The <u>Canton</u> hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force." <u>Id.</u> at 67.

The Eleventh Circuit has considered and rejected the contention, in several published decisions, that there existed an "obvious need" sufficient to show deliberate indifference. <u>See, e.g.</u>, <u>Gold</u>, 151 F.3d 1351–1353 (finding no obvious need to train officers on the Florida disorderly conduct statute or how to respond to handcuff complaints); <u>Lewis</u>, 561 F.3d at 1293–94 (finding no obvious need to train officers on the proper use of four-point "hobble" restraints); <u>Gray ex rel. Alexander v. Bostic</u>, 458 F.3d 1295, 1309 (11th Cir. 2006) (finding

no obvious need to train officers on the constitutional limits applicable to the particular circumstance of applying force on students in schools). Indeed, the undersigned has found no published Eleventh Circuit decision in which an obvious need to train sufficed to establish deliberate indifference. However, district courts in Florida have found that the failure to train officers on constitutional issues could amount to deliberate indifference based on the "obvious need" theory.[9] See, e.g., Ratlieff v. City of Ft. Lauderdale, No. 22-cv-61029-RAR, 2024 WL 4039849, *44 (S.D. Fla. Sept. 4, 2024) (holding that there was an obvious need to train police officers in a major metropolitan area on the First Amendment limits to the use of less-lethal weapons in crowd control); Johnson v. Israel, 576 F. Supp. 3d 1231, 1264 (S.D. Fla. 2021) (noting that "[w]hile it may be 'obvious' that police officers need some training on" false arrests and improper searches, the plaintiff's claims failed because the plaintiff "never claim[ed] that the [officers] received no such training or supervision") (emphasis in original).

Here, unlike in Johnson, Reed alleges that two of the Officers claimed to have received no training on the constitutional limitations of strip searches. See

---

[9] The Court recognizes that decisions of other district courts are not binding, but they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

Complaint ¶ 65. Although this presents a close call, drawing all reasonable inferences in Reed's favor, this allegation permits the plausible inference that JSO does not train its officers on the constitutional limitations of roadside searches performed to uncover evidence. Some of Reed's other allegations also support the inference that the constitutional limits of strip searches are not included in whatever training JSO provides its officers regarding searches. See id. ¶ 61 (allegation that one of the officers on scene stated that "he was glad his Field Training Officer trained him how to be a 'd-bag'"); id. ¶ 67 (allegation that Mazzone testified during the IA Investigation that "he had been trained to turn off his body-worn camera so as to not reveal JSO techniques"); id. ¶ 72 (allegation that Melton stated during the IA Investigation that "it's standard policy for us to search people" and that his "training and experience" taught him that when someone is "clenching," it "usually means" they have drugs hidden in their anus); and id. ¶ 77 (allegation that although at least seven JSO officers were on the scene of the second search, none of them objected or intervened).

Without a doubt, police in cities like Jacksonville regularly seek to uncover incriminating evidence by searching people. So, there is a high "likelihood that the situation" the Officers faced—the belief that there was a need to search an individual—"will recur." See Bryan Cnty., 520 U.S. at 409 (quoted). As with the application of deadly force, "[t]here is no reason to assume

that police academy applicants are familiar with the constitutional constraints" on strip searching individuals to uncover evidence. See Connick, 563 U.S. at 64 (quoted). And just as failing to train officers on the use of deadly force would obviously result in constitutional violations when those same officers are provided firearms, see id., failing to train officers on the permissible scope of searches used to uncover evidence would obviously result in constitutional violations when those same officers are deployed on drug-bust operations. Because Reed sufficiently alleges a constitutional violation—and Defendants do not contend otherwise—JSO is likely "to be on notice of its potential legal ramifications in this context." See Lewis, 561 F.3d at 1293 (quoted). In short, if JSO failed to train officers on the permissible scope of body searches conducted to uncover evidence, this failure could "justify a finding that [JSO's] decision not to train … reflected 'deliberate indifference'" to "[t]he right of the people to be secure in their persons … against unreasonable searches … ." See Bryan Cnty., 520 U.S. at 409 (quoted); U.S. CONST. Am. IV (quoted). And the allegations "may also support an inference of causation—that [JSO's] indifference led directly to the very consequence that was so predictable." See Bryan Cnty., 520 U.S. at 409–10 (quoted). Again, the Court underscores that this Order does not establish that JSO was in fact deliberately indifferent to peoples' Fourth Amendment rights by failing to train its officers. Rather, taking

- 26 -

the two Officers' alleged statements as true, Reed has alleged enough to open the gates of discovery on this narrow issue.

In the Sheriff's Motion, he argues that Reed's "alleged facts do not allow for the plausible inference that based on this single incident the need for training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. … [Reed's] allegations in the … Complaint are nothing more than a formulaic recitation of unsupported legal conclusions." Sheriff's Motion at 8 (internal quotation marks and quoted authority omitted) (alteration adopted). But while Reed does include legal conclusions and does recite the required elements of his claim in his Complaint, these are not the factual allegations on which Reed relies to support the inference that JSO fails to train its officers on the constitutional limitations of strip searches. Accordingly, the Sheriff's Motion is due to be denied as to Count II to the extent Reed advances the theory, supported by plausible factual content, that the Sheriff failed to train JSO officers on the constitutional limitations of strip searches and a reasonable jury could find that this failure amounts to deliberate indifference to the public's Fourth Amendment rights.

B.      State-Law Claims (Count III)

In Count III, Reed brings claims against the Officers for "Negligence <u>Per Se</u> under Florida Statute § 901.211." Complaint at 15.[10] In the Officers' Motion, the Officers argue that Reed's claims in Count III are barred by Florida's sovereign immunity statute, Section 768.28. <u>See</u> Officers' Motion at 4–7. For the reasons that follow, the Court concludes the Officers' Motion is due to be granted as to the claims in Count III.

Florida has a bifurcated scheme for waiving sovereign immunity. <u>See generally</u> Fla. Stat. § 768.28. Florida Statute section 768.28 provides immunity to a state employee:

> for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer … acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a) (2022). Thus, under section 768.28(9)(a), Florida grants immunity to state employees so long as they did not act with any of three states of mind: bad faith, malicious purpose, or wanton and willful disregard of human rights, safety, or property.

---

[10] Section 901.211 prescribes who can conduct strip searches and what standard of suspicion is required, and also constrains the place and manner of permissible strip searches. <u>See generally</u> Fla. Stat. § 901.211.

Courts construing the term "bad faith" in section 768.28(9)(a) use the actual malice standard. <u>Parker v. State Bd. of Regents ex rel. Fla. State Univ.</u>, 724 So. 2d 163, 167 (Fla. 1st DCA 1998). The term "malicious purpose" in section 768.28(9)(a) means the conduct must be committed with "ill will, hatred, spite, [or] an evil intent." <u>Reed v. State</u>, 837 So. 2d 366, 369 (Fla. 2002). For conduct to satisfy the wanton and willful disregard standard of section 768.28(9)(a), the conduct must be "worse than 'gross negligence,'" <u>Sierra v. Assoc. Marine Insts., Inc.</u>, 850 So. 2d 582, 593 (Fla. 2d DCA 2003), and "much more reprehensible and unacceptable than mere intentional conduct," <u>Richardson v. City of Pompano Beach</u>, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987). Florida's Fourth District Court of Appeal has instructed that, in the context of section 768.28(9)(a), "'wanton' means 'with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property,'" while "'[w]illful' means 'intentionally, knowingly and purposely.'" <u>Peterson v. Pollack</u>, 290 So. 3d 102, 110 (Fla. 4th DCA 2020) (quoting Fla. Std. Jury Instr. (Crim.) 7.9; Fla. Std. Jury Instr. (Crim.) 28.5; Fla. Std. Jury Instr. (Crim.) 28.19). So, each of the standards of fault required to pierce state-employee immunity under section 768.28(9)(a)—including the lowest standard, "wanton and willful disregard"—contains an element of culpable intent.

Where an officer, in the course of his or her employment with the municipality, engages in a wrongful act but does not do so maliciously, in bad faith, or with willful and wanton disregard, the municipality is the party to be held responsible. See, e.g., Gregory v. Miami-Dade Cnty., 719 F. App'x 859, 873 (11th Cir. 2017); Desai v. Farmer, No. 5:12-cv-495-Oc-34PRL, 2014 WL 5474417, *9 (M.D. Fla. Oct. 29, 2014); Hargis v. City of Orlando, No. 6:12-cv-723-Orl-37KRS, 2012 WL 6089715, *6 n.12 (M.D. Fla. Dec. 7, 2012); Petithomme v. Cnty. of Miami Dade, No. 11-20525-CIV, 2011 WL 3648622, *3 n.2 (S.D. Fla. Aug. 16, 2011); Peguero v. Delaurentos, No. 11-20069-CIV-JORDAN, 2011 WL 13223704, *1 (S.D. Fla. May 12, 2011); Burks v. Beary, 713 F. Supp. 2d 1350, 1360–61 (M.D. Fla. 2010). In other words, under Florida law, a party can only succeed in a tort claim against an individual officer, or the government entity who employed that officer, but not both. See Ullman v. Fla. Dep't of Corr., No. 5:17-cv-66-Oc-30PRL, 2017 WL 2103392, *2 (M.D. Fla. May 15, 2017) (citing McGhee v. Volusia Cnty., 679 So. 2d 729, 733 (Fla. 1996)); Desai, 2014 WL 5474417, at *9; Hargis, 2012 WL 6089715, at *6 n.12.

Importantly, under Florida law, "it is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort." City of Miami v. Sanders, 672

So. 2d 46, 48 (Fla. 3d DCA 1996). Therefore, "the sole basis and limit of an arresting officer's liability in making a lawful arrest is founded on a claim of battery." Id.[11] In addition, when a plaintiff sues on a negligence theory, but the evidence or allegations reveal that what actually took place was an intentional tort, the action must be dismissed. See Quilling v. Price, 894 So. 2d 1061, 1064 (Fla. 5th DCA 2005) (dismissing a claim for negligence when the allegations in the complaint stated a claim for battery); McDonald v. Ford, 223 So. 2d 553, 554–55 (Fla. 2d DCA 1969) (affirming a trial court's entry of directed verdict against the plaintiff who "sued on a negligence theory" when "it [wa]s clear that what actually occurred … was an assault and battery"). However, "'a separate negligence claim based upon a distinct act of negligence may be brought against a police officer in conjunction with a claim for excessive use of force, … [but] the negligence component must pertain to something other than the actual application of force during the course of arrest.'" Secondo v. Campbell, 327 F. App'x 126, 131 (11th Cir. 2009) (quoting Sanders, 672 So. 2d at 48) (omission and alteration in original). For example, "a cause of action for the negligent handling of a firearm and the negligent decision to use a firearm separate and distinct from an excessive force claim" is recognized under Florida law. Lewis

_____

[11] Of course, in the case of unlawful police conduct, like that alleged in this case, actions against individual officers can also be based upon § 1983.

v. City of St. Petersburg, 260 F.3d 1260, 1263 (11th Cir. 2001); see also Wyatt v. City of Jacksonville, No. 3:08-cv-264-J-32TEM, 2008 WL 2916358, *1 (M.D. Fla. July 29, 2008) (finding that the plaintiff adequately alleged a cause of action for negligent handling of a police dog).[12]

Here, the Court finds that Reed's negligence claims against the Officers are due to be dismissed. To the extent Reed alleges that the Officers were merely negligent, the Officers are entitled to statutory immunity. See Fla. Stat. § 768.28(9)(a); Keck v. Eminisor, 104 So. 3d 359, 366 (Fla. 2012) (per curiam) ("The complaint alleges that Keck committed ordinary negligence, and thus, pursuant to section 768.28(9)(a), he cannot be liable or even be named as a party defendant in the action … ."). And to the extent Reed alleges the Officers acted with a malicious purpose or a wanton and willful disregard for human rights, their actions were intentional torts, which are mutually exclusive of negligence claims. See, e.g., Quilling, 894 So. 2d at 1064. In either case, Reed has failed to state plausible claims for negligence against the Officers.

Reed's arguments to the contrary are unavailing. Reed contends that under Sierra, willful and wanton misconduct is not necessarily "worse than"

---

[12] Some of the cases cited arise in the excessive-force context, not in the unreasonable-search context. The parties do not identify any reason to distinguish Sanders on this basis, and the Court concludes the same principles enunciated in Sanders and related cases apply equally in the unreasonable-search context as in the excessive-force context.

gross negligence. See Response to the Officers' Motion at 4–6. In essence, Reed argues that a plaintiff can state a claim for negligence in a "Goldilocks zone," where the conduct is just culpable enough to pierce statutory immunity, but not so culpable as to require the claim to be pled as an intentional tort. See id. at 4–8. Relying on cases defining wantonness in the context of the punitive damages statute, section 768.72(2),[13] Reed maintains that the culpability standard must be compatible with negligence actions because punitive damages are available in negligence actions when the defendant's conduct was wanton. See id. at 5–6. But, although standards like "gross negligence" and "wanton disregard" defy easy categorization, the Court concludes that the standard of fault required for punitive damages under section 768.72(2) is lower than that required to pierce statutory immunity under section 768.28(9)(a). As an initial matter, the Court notes that the language in the two statutes is different. The punitive damages statute provides that punitive damages are available when the trier of fact finds a defendant "personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). The statute defines "gross negligence" as conduct "so reckless or wanting in care that it constituted a

---

[13] In the Response to the Officers' Motion, Reed repeatedly refers to the punitive statute as section 762.72. See Response to the Officers' Motion at 5. There is no such statute. The punitive damages statute is section 768.72.

conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Id. § 768.72(2)(b). The Florida Supreme Court has elaborated on this standard of fault, stating that the low-fault cutoff for punitive damages is conduct that shows "more than simple negligence, but less than intent or malice … ." Valladares v. Bank of Am. Corp., 197 So. 3d 1, 11 (Fla. 2016). The sovereign immunity statute, on the other hand, requires "wanton and willful disregard" to allow for individual liability. Fla. Stat. § 768.28(9)(a) (emphasis added). Moreover, the Court is obligated to follow the decisions of the Florida state courts that have interpreted section 768.28(9)(a), not those discussing punitive damages.[14] These decisions establish that intentional misconduct is required to pierce an officer's statutory immunity. See Richardson, 511 So. 2d at 1123 (requiring fault "much more reprehensible and unacceptable than mere intentional conduct" to pierce statutory immunity); Sierra, 850 So. 2d at 593 (postulating fault "worse than 'gross negligence,'" to

---

[14] Florida's intermediate appellate courts bind this Court on questions of federal law. As the Eleventh Circuit has explained:

> [A]bsent a decision from the state supreme court on an issue of state law, we are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently. … That rule is, if anything, particularly appropriate in Florida, where the state's highest court has held that "[t]he decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by [the Florida Supreme Court]."

See McMahan v. Toto, 311 F.3d 1077, 1080 (11th Cir. 2002) (cited authority omitted) (quoting Pardo v. State, 596 So. 2d 665, 666 (Fla. 1992)).

pierce statutory immunity); <u>see also</u> <u>Butler v. Gualtieri</u>, 41 F.4th 1329, 1336–37 (11th Cir. 2022) (summarizing Florida cases interpreting the standards of fault in section 768.28(9)(a)). While Reed attempts to cast doubt on the definitiveness of the quoted language in <u>Sierra</u>, <u>Richardson</u> answers the question unambiguously. Nothing in <u>Sierra</u> or any other authority Reed offers contradicts this conclusion. Accordingly, the claims in Count III are due to be dismissed.

C.      Declaratory Judgment Claim (Count IV)

In Count IV, Reed brings claims for declaratory judgment that do nothing but reincorporate all of the preceding allegations of Reed's Complaint, including the first three claims for relief.[15] Complaint ¶¶ 117–19. Reed contends that "[a]n actual controversy has arisen and now exists" because Reed alleges "Defendants violated his rights not to be subjected to unreasonable searches … ." <u>Id.</u> ¶ 118. Defendants argue these claims must be dismissed for lack of standing. <u>See generally</u> Sheriff's Motion; Officers' Motion.

"To establish standing, a plaintiff must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3)

---

[15] As such, Count IV is a quintessential shotgun claim, of the sort the Eleventh Circuit has consistently and unambiguously condemned for decades. <u>See</u> <u>Weiland</u>, 792 F.3d at 1321–23 (describing the Eleventh Circuit's "thirty-year salvo of criticism aimed at shotgun pleadings," including those in which later counts incorporate earlier counts).

that is likely to be redressed by a favorable judicial decision." <u>Cambridge Christian Sch., Inc. v. Fla. High Sch. Athl. Assn., Inc.</u>, 115 F.4th 1266, 1281 (11th Cir. 2024) (internal quotation marks and quoted authority omitted). Under well-established law, "a plaintiff has standing to seek declaratory relief only when there is a substantial likelihood that he will suffer injury in the future." <u>Id.</u> (internal quotation marks and quoted authority omitted); <u>see also City of Los Angeles v. Lyons</u>, 461 U.S. 95, 104 (1983). Indeed, declaratory relief is designed not to reach back into the past and adjudge who wronged who, but rather to help expeditiously resolve the rights of parties who remain in an ongoing relationship and thereby keep them from damaging one another as they each try to minimize their own risk. <u>See</u> <u>Emory v. Peeler</u>, 756 F.2d 1547, 1552 (11th Cir. 1985) ("A declaration that [the defendant's] past conduct violated [the plaintiff's] constitutional rights … 'would [be] nothing more than a gratuitous comment without any force or effect.'") (quoted authority omitted) (last alteration in original). Here, Reed has alleged no facts that would give rise to an inference that "there is a substantial likelihood that he will suffer injury [from Defendants] in the future," and thus, Reed lacks standing to assert claims

for declaratory relief. See Cambridge Christian, 115 F.4th at 1281 (quoted).[16]

Accordingly, his claims in Count IV are due to be dismissed without prejudice.[17]

## IV.   Conclusion

For the foregoing reasons, Reed has failed to state a Monell claim against the Sheriff premised on a widespread custom of unconstitutional searches by

---

[16] Reed contends that Uzuegbunam v. Preczewski, a 2021 Supreme Court decision, establishes that a plaintiff has standing when they seek declaratory relief for a past injury. See Response to the Officers' Motion at 12–14 (citing Uzuegbunam v. Preczewski, 592 U.S. 279 (2021)). In Uzuegbunam, the Court held that a plaintiff has standing when they demand nominal damages to redress a defendant's past violation of their constitutional rights. See generally 592 U.S. 279. According to Reed, "If federal court jurisdiction on a claim under the Declaratory Judgment Act is co-extensive with federal court Article III subject-matter jurisdiction, and the existence of nominal damages establishes and maintains Article III subject-matter jurisdiction, it must logically follow that the existence of nominal damages likewise establishes and maintains federal court jurisdiction under the Declaratory Judgment Act." Response to the Officers' Motion at 13. But, as Uzuegbunam makes clear, standing turns on the relationship between the injury suffered and the relief sought. See generally Uzuegbunam, 592 U.S. 279. Just because nominal damages can provide redress for past injuries, it does not follow that declaratory judgment can do so also. Indeed, unlike declaratory judgments, nominal damages are deeply rooted in the common law as a means of redressing past rights violations. See id. at 798–800. Moreover, unlike declaratory judgments, "[b]ecause nominal damages are in fact damages paid to the plaintiff, they 'affec[t] the behavior of the defendant towards the plaintiff' and thus independently provide redress." Id. at 801 (quoted authority omitted) (second alteration in original). Indeed, in Cambridge Christian, three years after Uzuegbunam, the Eleventh Circuit noted that "a claim for declaratory relief becomes moot when there is no longer 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Cambridge Christian, 115 F.4th at 1283 (quoted authority omitted) (emphasis in original).

[17] In the context of declaratory relief being sought for past injuries, standing is jurisdictional. See Cambridge Christian, 115 F.4th at 1296 (holding that the plaintiff lacked standing to pursue declaratory relief claims and remanding "with instructions for the district court to dismiss those claims for lack of subject matter jurisdiction."). As such, a dismissal on standing grounds is without prejudice. See Wiand v. ATC Brokers Ltd., 96 F.4th 1303, 1312 (11th Cir. 2024) (Marcus, J., concurring) ("A dismissal for lack of standing … is a non-merits decision and so is generally without prejudice and does not have any preclusive effect.") (citing Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008) (per curiam); Hughes v. Lott, 350 F.3d 1157, 1161 (11th Cir. 2003)).

JSO officers. However, Reed has stated a plausible claim based on deliberate indifference to the Fourth Amendment rights of the public, premised on the Sheriff's alleged failure to train JSO officers on the constitutional limits of searches used to uncover evidence. Reed also has failed to state state-law claims against the Officers because negligence claims against the Officers are barred by Florida's sovereign-immunity statute. And, Reed does not have standing to bring his claims for declaratory relief.

Accordingly, it is

**ORDERED:**

1.   The Individual Defendants' Motion to Dismiss Counts III and IV (Doc. 32) is **GRANTED IN PART** and **DENIED IN PART**.

  A.   The Individual Defendants' Motion is **GRANTED** as to Count III.

  B.   The Individual Defendants' Motion is **GRANTED** to the extent that Count IV is **dismissed without prejudice**. The Motion is otherwise **DENIED** as to Count IV.

2.   Thomas Waters's Motion to Dismiss the Amended Complaint (Doc. 33) is **GRANTED IN PART** and **DENIED IN PART**.

  A.   Waters's Motion is **GRANTED IN PART** and **DENIED IN PART** as to Count II. The Motion is **DENIED** to the extent

that Ronnie Reed asserts a cause of action based on the Sheriff's alleged deliberate indifference to the Fourth Amendment rights of the public based on the Sheriff's failure to train officers on the constitutional limits of searching to uncover evidence. The Motion is **GRANTED** to the extent that Count II is dismissed in all other respects.

B.   Waters's Motion is **GRANTED** to the extent that Count IV is **dismissed without prejudice**. The Motion is otherwise **DENIED** as to Count IV.

3.   The Defendants must answer the Complaint in accordance with Rule 12.

**DONE AND ORDERED** in Jacksonville, Florida this 18th day of October, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

lc33

Copies to:
Counsel of Record